IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DANETTA McINTOSH, Individually    §
and on Behalf of THE ESTATE OF    §
ROBERT McINTOSH, Deceased,        §
                                  §
          Plaintiff,              §
                                  §
v.                                §        CIVIL ACTION NO. H-07-3654
                                  §
LEONARD P. SMITH, Individually    §
and in His Official Capacity,     §
and THE CITY OF HOUSTON,          §
                                  §
          Defendants.             §

## MEMORANDUM OPINION AND ORDER

Plaintiff, Danetta McIntosh, as administrator of the Estate of Robert McIntosh (McIntosh), brings this action against defendants, Leonard P. Smith, a Houston Police Officer, and the City of Houston, pursuant to 42 U.S.C. § 1983 and the Texas Tort Claims Act, Tex. Civ. Prac. & Rem. Code § 101.021, et seq., for claims arising from McIntosh's death as Smith was attempting to arrest him on January 8, 2007.  Pending before the court is Defendants' Motion for Summary Judgment (Docket Entry No. 45).  For the reasons explained below, Officer Smith's motion for summary judgment will be granted in part and denied in part, and the City of Houston's motion for summary judgment will be granted.

## I.  Undisputed Facts

On January 8, 2007, Officer Smith executed a traffic stop of a vehicle in which McIntosh was riding.  Officer Smith contends

that after smelling PCP on McIntosh, he searched McIntosh for weapons at the rear of the vehicle, that when he felt a "leafy substance" in McIntosh's pocket, he began to handcuff McIntosh, and that McIntosh resisted and tried to escape on foot down Knoxville Street.  Officer Smith chased McIntosh and fired his taser at McIntosh, but only one of the taser's two darts hit McIntosh.  Both men ended up in a drainage ditch on the side of Knoxville Street, where Officer Smith shot McIntosh.  The events in the drainage ditch are disputed.[1]

## II.   **Standard of Review**

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment.  Fed. R. Civ. P. 56(c).  Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2511 (1986).  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear

---

[1]Plaintiff Danetta McIntosh's Response to Defendants' Motion for Summary Judgment (Plaintiff's Response), Docket Entry No. 46, p. 3 ¶¶ 4-5.

the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 106 S.Ct. 2548, 2552 (1986).   If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial.  <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (<u>en banc</u>). In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Products Inc.</u>, 120 S.Ct. 2097, 2110 (2000).

### III.  <u>Federal Law Claims Asserted Against Officer Smith</u>

Plaintiff alleges that when Officer Smith shot McIntosh he violated rights protected by the Fourth Amendment to the United States Constitution by using excessive force to seize McIntosh, and that he violated rights protected by the Fourteenth Amendment to the United States Constitution by summarily executing McIntosh without due process of law, and by failing to provide medical aid to McIntosh following the shooting.  Asserting that he is entitled to qualified immunity from the claims that plaintiff has alleged against him, Officer Smith seeks summary judgment.

### A.  Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages [by

-3-

qualified immunity] insofar as their conduct does not violate
clearly established statutory or constitutional rights of which a
reasonable person would have known." Easter v. Powell, 467 F.3d
459, 462 (5th Cir. 2006) (quoting Harlow v. Fitzgerald, 102 S.Ct.
2727, 2738 (1982)).  When assessing a defendant's assertion of
qualified immunity, courts engage in a two-step analysis.  Using
current constitutional standards courts determine whether the
plaintiff has alleged the violation of a clearly established
constitutional right.  Id. (citing Rankin v. Klevenhagen, 5 F.3d
103, 105 (5th Cir. 1993)).  Courts must also determine if the
defendant's conduct was objectively reasonable in light of the law
that was clearly established when the alleged violation occurred.
Id. (citing Rankin, 5 F.3d at 108).  "A government official is
entitled to qualified immunity if either (1) the plaintiff failed
to state a constitutional claim or (2) the defendant's conduct was
objectively reasonable in light of the clearly established law."
Id.  Whether an official's actions were objectively reasonable "is
a matter of law for the courts to decide, not a matter for the jury
. . . However, underlying historical facts may be in dispute that
are material to the reasonableness determination." Williams v.
Bramer, 180 F.3d 699, 703 (5th Cir.), clarified on rehearing by,
186 F.3d 633 (5th Cir. 1999).

Officer Smith does not dispute that the claims plaintiff has
alleged for violation of the Fourth and Fourteenth Amendments
allege violations of constitutional rights that were clearly

-4-

established on January 8, 2007.  Instead, Officer Smith argues that he is entitled to qualified immunity from the federal claims that plaintiff has asserted against him because his actions were objectively reasonable in light of the information he possessed and the then clearly established law.  For the plaintiff to overcome Officer Smith's assertion of qualified immunity she must demonstrate that the constitutional right that Officer Smith allegedly violated was clearly established when the alleged violation occurred, and that Officer Smith's conduct was objectively unreasonable in light of clearly established law.  Id.

**B.  Analysis**

   1.   Fourth Amendment Claim

   Plaintiff alleges that Officer Smith violated McIntosh's Fourth Amendment right to be free from unreasonable seizure using excessive force when he shot McIntosh while McIntosh was restrained by handcuffs with his hands behind his back and not posing any threat to Officer Smith or to the public.  The parties do not dispute that McIntosh died from wounds inflicted by Officer Smith's gunshots.

      (a)  Applicable Law

   The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  United States Constitution, Amendment IV.   The Fourth Amendment's protection against

-5-

unreasonable seizures of the person has been applied in causes of
action under 42 U.S.C. § 1983 to impose liability on police
officers who use excessive force to apprehend suspects.  <u>See</u>
<u>Colston v. Barnhart</u>, 130 F.3d 96, 102 (5th Cir. 1997), <u>cert.</u>
<u>denied</u>, 119 S.Ct. 618 (1998).  To prevail on a claim for the
excessive use of force in violation of the Fourth Amendment,
plaintiff must show that McIntosh was seized within the meaning of
the Fourth Amendment, <u>Graham v. Connor</u>, 109 S.Ct. 1865, 1870-71,
(1989), and that during the course of the seizure McIntosh suffered
an "(1) injury, (2) which resulted directly and only from a use of
force that was clearly excessive, and (3) the excessiveness of
which was clearly unreasonable." <u>Collier v. Montgomery</u>, 569 F.3d
214, 218 (5th Cir. 2009) (quoting <u>Tarver v. City of Edna</u>, 410 F.3d
745, 751 (5th Cir. 2005)).  Only intentional conduct of government
actors invokes the protections of the Fourth Amendment.  <u>Brower v.</u>
<u>County of Inyo</u>, 109 S.Ct. 1378, 1381 (1989) ("Violation of the
Fourth Amendment requires an intentional acquisition of physical
control.").

A seizure triggering the Fourth Amendment occurs whenever
government actors "by means of physical force or show of authority,
ha[ve] in some way restrained the liberty of a citizen." <u>Terry v.</u>
<u>Ohio</u>, 88 S.Ct. 1868, 1879 & n.16 (1968).  "An injury is generally
legally cognizable when it results from a degree of force that is
constitutionally impermissible — that is, objectively unreasonable
under the circumstances." <u>Collier</u>, 569 F.3d at 218 (quoting <u>Bush</u>

-6-

v. Strain, 513 F.3d 492, 501 (5th Cir. 2008)).  "The objective
reasonableness of the force, in turn, depends on the facts and
circumstances of the particular case, such that the need for force
determines how much force is constitutionally permissible."  Id.
(quoting Bush, 513 F.3d at 501).  To determine whether the force
used by the officer was unreasonable, the Fourth Amendment
prescribes a case-specific balancing exercise in which the court
must consider "the severity of the crime at issue, whether the
suspect poses an immediate threat to the safety of the officers or
others, and whether he is actively resisting arrest or attempting
to evade arrest by flight."  Graham, 109 S.Ct. at 1872 (citing
Tennessee v. Garner, 105 S.Ct. 1694, 1700 (1985) ("the question
[i]s whether the totality of the circumstances justified a
particular sort of search or seizure")).  In Graham the Supreme
Court explained the perspective from which courts are to evaluate
a claim for the excessive use of force under the Fourth Amendment:

> The "reasonableness" of a particular use of force must be
> judged from the perspective of a reasonable officer on
> the scene, rather than with the 20/20 vision of hindsight
> . . .  The calculus of reasonableness must embody
> allowance for the fact that police officers are often
> forced to make split-second judgments — in circumstances
> that are tense, uncertain, and rapidly evolving — about
> the amount of force that is necessary in a particular
> situation.

Id.  Only the objective reasonableness of force matters for Fourth
Amendment purposes; an officer's subjective motivation and intent
are irrelevant.  Id. at 1872-73 ("subjective motivations of the
individual officers . . . [have] no bearing on whether a particular

-7-

seizure is 'unreasonable' under the Fourth amendment"). The court must measure the force used under the facts as a reasonable officer would perceive them. Id. at 1872. See also Reese v. Anderson, 926 F.2d 494, 501 (5th Cir. 1991) (finding no Fourth Amendment violation where an officer shot and killed an unarmed suspect who the officer reasonably believed to be armed).

(b)  Application of the Law to the Facts

Officer Smith contends that he is entitled to qualified immunity on plaintiff's Fourth Amendment claim for excessive use of force because his decision to shoot McIntosh was reasonable under the circumstances. According to Officer Smith, McIntosh stumbled while attempting to flee and Smith tackled McIntosh, who landed face down in a drainage ditch with Smith straddling his back. Smith says that he threw his handcuffs off to the side and began "driving the stun of the taser in [McIntosh's] back as hard as [he could] . . . to make [McIntosh] . . . feel more pain and stop moving."[2] McIntosh managed to roll over so that he was laying on one side of the ditch facing Smith, that when he attempted to drive stun McIntosh in the chest, McIntosh grabbed the taser, breaking Smith's thumb in the process, and then tased Smith on the neck and shoulder.[3] Officer Smith then grabbed his gun and shot McIntosh.[4]

---

[2]Deposition of Officer Leonard P. Smith (Smith Deposition), Exhibit A attached to Plaintiff's Response, Docket Entry No. 46, p. 107, lines 17-19.

[3]Id. at 107-115.

[4]Id. at 116, lines 7-16.

Officer Smith contends that his decision to shoot McIntosh was
reasonable because

> he felt he was in danger of losing control totally of the
> situation when McIntosh turned the Taser on him and, in
> so doing, broke the thumb of his dominant hand. Officer
> Smith never had the opportunity to complete the pat-down
> of McIntosh before McIntosh took off running, and did not
> know if McIntosh might have a weapon concealed on him
> somewhere. Finally, Officer Smith feared McIntosh could
> gain control of him, by tasering him further, and
> possibly grab the officer's gun.[5]

As corroboration for his account of the events that occurred in the
drainage ditch, Officer Smith cites accounts provided by eye-
witnesses Majelon Patterson and Dedric Deon Fitzgerald, who stated
that they saw Officer Smith shoot McIntosh, and that when Officer
Smith shot McIntosh, McIntosh was struggling with Smith and was not
wearing handcuffs.[6]

Plaintiff contends that Officer Smith is not entitled to
qualified immunity because his decision to shoot McIntosh was not
objectively reasonable under the circumstances.[7] In support of her
contention, plaintiff cites the deposition testimony of eyewitness

---

[5]Defendants' Motion for Summary Judgment (Defendants' Motion),
Docket Entry No. 45, p. 10 (citing Deposition of Officer Leonard P.
Smith (Smith Deposition), Exhibit A attached to Docket Entry
No. 45, pp. 98, lines 4-25; 99, line 1; 115, lines 15-23; 117,
lines 23-25; and 118, lines 1-13).

[6]See Deposition of Majelon Patterson, Exhibit H attached to
Defendants' Motion, Docket Entry No. 45, p. 18, line 22 - p. 20,
line 3 and p. 39, line 22 - p. 41, line 5; and Witness Statement of
Dedric Deon Fitzgerald, Exhibit I attached to Defendants' Motion,
Docket Entry No. 45.

[7]Plaintiff's Response, Docket Entry No. 46, pp. 9-14.

Yolanda Perry whose description of the events that transpired in the drainage ditch differs greatly from the descriptions provided by Smith, Patterson, and Fitzgerald.[8]

Perry testified that she saw McIntosh for the first time as she was on her way from Pearland to her husband's church on Knoxville Street.  While she was waiting to turn onto Knoxville Street, Perry saw Officer Smith pat McIntosh down to the knees at the rear of a car pulled over at the side of the road, she saw McIntosh come out of his shirts and run away from Smith down Knoxville Street, and she saw Smith taser McIntosh in the back.[9] Perry testified that she followed McIntosh and Smith down Knoxville in her car, that as McIntosh tried to jump a drainage ditch, he slipped and fell forward into the ditch, and that Smith then jumped on McIntosh's back.[10]  McIntosh appeared to have been too tired to fight Officer Smith and did not fight Officer Smith.  Officer Smith grabbed McIntosh's outstretched arms and handcuffed them behind McIntosh's back, and Officer Smith then stood up, rolled McIntosh over onto his back, hit McIntosh in the face with a black object, and then shot McIntosh several times.[11]  Perry testified that after the shooting, Officer Smith took the handcuffs off of McIntosh, and

_____

[8]Deposition of Yolanda Perry (Perry Deposition), Exhibit B attached to Plaintiff's Response, Docket Entry No. 46,

[9]Id. at 10-11.

[10]Id. at 16-17.

[11]Id. at 17-19.

called for help.[12]  Perry explained that she watched the events from
only a few feet away, that she never saw McIntosh grab the taser
from Officer Smith, and that she never saw McIntosh pose any threat
to Officer Smith or to the public.[13]  Perry surmised that Officer
Smith must have broken his thumb when McIntosh came out of his
shirt in order to flee.[14]  Perry testified that she heard that
others who witnessed the events in the drainage ditch changed their
stories when questioned by police "because some of them had prior
backgrounds."[15]

If, as Officer Smith, Patterson, and Fitzgerald have stated,
McIntosh actively resisted arrest by struggling with Smith in the
drainage ditch, and if as Smith stated during that struggle
McIntosh posed an immediate threat to Smith's safety because the
thumb on Smith's dominant hand was broken and Smith did not know if
McIntosh had a concealed weapon, then Smith's use of deadly force
to apprehend McIntosh would have been reasonable under the totality
of circumstances.  However, if as Perry testified, Officer Smith
shot McIntosh when he posed no threat to Officer Smith or the
public because his hands were cuffed behind his back, then Officer
Smith's use of deadly force against McIntosh would not have been

---

[12]Id. at 20.

[13]Id. at 19-20.

[14]Id. at 29.

[15]Id. at 22, lines 5-6.

-11-

reasonable under the circumstances.  See Garner, 105 S.Ct. at 1701 (reasoning that a police officer may not seize an unarmed, non-dangerous suspect by shooting him to prevent flight).  Therefore, the legal question of whether Officer Smith is entitled to qualified immunity for his decision to shoot McIntosh cannot be resolved until the substantial differences in the factual accounts provided by the eyewitnesses are resolved.  Since these differences cannot be resolved without weighing the evidence and judging the credibility of the witnesses,[16] the court concludes that Smith's motion for summary judgment on plaintiff's Fourth Amendment claim for the use of excessive force must be denied because whether Officer Smith is entitled to qualified immunity depends upon genuine issues of material fact that must be decided by the jury. See Reeves, 120 S.Ct. at 2110 ("the court . . . may not make credibility determinations or weigh the evidence").

   2.   Fourteenth Amendment Claims

   Plaintiff alleges that Officer Smith violated McIntosh's Fourteenth Amendment right to due process of law by summarily executing McIntosh and by exhibiting deliberate indifference to McIntosh's need for medical care.

---

[16]See Defendants' Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment (Defendants' Reply), Docket Entry No. 47, p. 2 (recognizing that "Ms. Perry's testimony is in direct contradiction of the testimony of at least five (5) other witnesses").  Although defendants argue that Perry is not a credible witness, at this stage of the case, the credibility of the witnesses is not a factor the court may consider.

(a)  Applicable Law

"The Due Process Clause of the Fourteenth Amendment was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'" Collins v. City of Harker Heights, Texas, 112 S.Ct. 1061, 1069 (1992) (quoting DeShaney v. Winnebago County Department of Social Services, 109 S.Ct. 998, 1003 (1989), and Davidson v. Cannon, 106 S.Ct. 668, 670 (1986)).  "The most familiar office of that Clause is [the procedural component which guarantees] . . . fair procedure in connection with any deprivation of life, liberty, or property by a State." Id. at 1068.  The substantive component of the Due Process Clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" Id. (quoting Daniels v. Williams, 106 S.Ct. 662, 665 (1986)).  However, the "Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation." DeShaney, 109 S.Ct. at 1006.

(b)  Application of the Law to the Facts

**(1)  Summary Execution**

Smith contends that he is entitled to summary judgment on plaintiff's Fourteenth Amendment claim for summary execution because "[p]laintiff has absolutely no competent evidence to support this theory of liability. The overwhelming evidence

-13-

supports the officer's version of how the events unfolded."[17] Plaintiff responds that Smith is not entitled to summary judgment on this claim because Perry's testimony establishes that Smith took McIntosh's punishment into his own hands and summarily executed McIntosh after McIntosh was placed in handcuffs, and because "[s]hooting an unarmed, defenseless, restrained suspect is the very epitome of summary execution."[18]

Four people claim to have witnessed the events that transpired in the drainage ditch:  Smith, Perry, Patterson, and Fitzgerald. One of these witnesses (Perry) says that McIntosh was shot while his hands were cuffed behind his back; the three other witnesses say that McIntosh was not restrained in handcuffs when Officer Smith shot him but, instead, was actively struggling with Smith. At this stage of the case the court may not weigh the evidence and/or judge the credibility of the witnesses.  See Reeves, 120 S.Ct. at 2110.  Accordingly, for essentially the same reasons that the court has already concluded that genuine issues of material fact preclude the grant of summary judgment on plaintiff's claim for the excessive use of force in violation of the Fourth Amendment, the court concludes that Smith's motion for summary judgment on plaintiff's Fourteenth Amendment claim for summary execution must be denied because the legal question regarding

---

[17]Defendants' Motion, Docket Entry No. 45, p. 13 ¶ 21.

[18]Plaintiff's Response, Docket Entry No. 46, p. 15 § 38.

whether Officer Smith is entitled to qualified immunity depends upon the resolution of genuine issues of material fact.

### (2)  Denial of Medical Care

Officer Smith argues that he is entitled to qualified immunity on plaintiff's claim for failure to provide medical care following the shooting because "[t]he uncontroverted evidence is that HPD [Houston Police Department] Dispatch was notified of the need for emergency personnel at the scene at approximately 12:59 p.m.  HFD [Houston Fire Department] records indicate notification at 13:02, and arrival on scene at 13:07."[19]  Citing Gonzalez v. Harris County, Texas, 2009 WL 995709 (S.D. Tex. 2009) (unpublished), Smith argues that "[i]t has been held that transportation of a wounded suspect from the scene to a medical facility is sufficient to defeat a claim for failure to provide medical care."[20]

The Due Process Clause of the Fourteenth Amendment protects an arrestee's right not to have his serious medical needs met with deliberate indifference on the part of arresting officers.  See Hill v. Carroll County, Mississippi, 587 F.3d 230, 237 (5th Cir. 2009) (citing Nerren v. Livingston Police Department, 86 F.3d 469, 473 (5th Cir. 1996) ("After the initial incidents of a seizure have concluded and an individual is being detained by police officials

---

[19]Defendants' Motion, Docket Entry No. 45, p. 19 ¶ 30.

[20]Id.

-15-

but has yet to be booked, an arrestee's right to medical attention, like that of a pre-trial detainee, derives from the Fourteenth Amendment.")).   See also City of Revere v. Massachusetts General Hospital, 103 S.Ct. 2979, 2983 (1983) ("The Due Process Clause . . . require[s] the responsible government or governmental agency to provide medical care to persons, such as [McIntosh], who have been injured while being apprehended by the police."). "Deliberate indifference, as defined in due process cases, requires both that the government official have 'subjective knowledge of substantial risk of serious harm to a pretrial detainee' and that the government official respond with 'deliberate indifference to that risk.'" United States v. Gonzales, 436 F.3d 560, 573 (5th Cir. 2006) (quoting Hare v. City of Corinth, Mississippi, 74 F.3d 633, 650 (5th Cir. 1996) (en banc)).

> Deliberate indifference in the context of an episodic failure to provide reasonable medical care to . . . [an arrestee] means that: 1) the official was aware of facts from which an inference of substantial risk of serious harm could be drawn; 2) the official actually drew that inference; and 3) the official's response indicates the official subjectively intended that harm occur.

Thompson v. Upshur County, Texas, 245 F.3d 447, 458-459 (5th Cir. 2001).

A government official's knowledge of a substantial risk of harm may be inferred if the risk was obvious.   Gonzales, 436 F.3d at 573 (citing Farmer v. Brennan, 114 S.Ct. 1970, 1981 (1994)). The determination of the objective reasonableness of particular

conduct in light of the subjective deliberate indifference standard is a question of law for the court. See Jacobs v. West Feliciana Sheriff's Department, 228 F.3d 388, 394 (5th Cir. 2000). The Fifth Circuit has explained that this standard requires the court "to determine whether, in light of the facts as viewed in the light most favorable to the plaintiff[], the conduct of the individual defendants was objectively unreasonable when applied against the deliberate indifference standard." Id. To raise a genuine issue of material fact for trial that Officer Smith acted with deliberate indifference, the plaintiff must present evidence from which a reasonable fact-finder could conclude that Officer Smith "refused to treat [McIntosh], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical need." Domino v. Texas Department of Criminal Justice, 239 F.3d 752, 755 (5th Cir. 2001). Delay in providing medical care gives rise to a constitutional violation if the deliberate indifference results in substantial harm. See Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir. 1993).

Officer Smith argues that there is no evidence in the record that he is a trained medical technician or that he had any particular medical expertise that would render him capable of providing medical assistance to a person wounded by a gunshot. Instead, he argues that the uncontroverted evidence establishes

that emergency medical personnel were called to the scene immediately after the shooting occurred.   Officer Smith argues that, as a matter of law, calling for transport of a wounded suspect to a medical facility is sufficient to defeat a claim for failure to provide medical care.[21]

Plaintiff does not directly address these arguments in her response.   Instead, plaintiff contends that Officer Smith is not entitled to qualified immunity because

> [t]he undisputed physical evidence revealed by the autopsy means that Smith shot [McIntosh] three times and then he disengaged from [McIntosh] and shot him a fourth time.   Smith had a duty to provide medical aid after the third shot, when he could safely extricate himself from the "zone of danger."   He obviously could extricate himself, because he did — at least to the point where he was out of reach of the taser in drive-stun mode.   The muzzle of Smith's gun was at least three feet from [McIntosh].   [McIntosh] was nearly naked, in a ditch, exhausted, with one bullet in his chest, one in his upper stomach and one in his lower stomach.   He was armed with no weapon capable of causing Smith harm.   Smith stepped back and fired the fatal shot to [McIntosh's] crotch, causing him to bleed to death.[22]

Viewing the facts in the light most favorable to the plaintiff, there is no evidence that Officer Smith exhibited deliberate indifference by denying or delaying medical treatment to McIntosh after the shooting.   The eyewitnesses whose statements touch upon this subject all agree that all the shots Officer Smith fired at McIntosh occurred in rapid succession, and that

---

[21]Id. at 18-19 ¶¶ 28-30.

[22]Plaintiff's Response, Docket Entry No. 46, pp. 15-16 ¶ 41.

immediately thereafter Officer Smith radioed that the suspect was
down.[23]   The evidence on which plaintiff relies from the autopsy
report does not controvert the evidence provided by the
eyewitnesses concerning the rapidity with which the shots were
fired.  Although plaintiff's expert, Dr. Wilson, testified at his
deposition that bullet wound A was a contact wound, bullet wound B
was a contact or near contact wound, bullet wound C might not have
been a contact wound but, instead, a close range or intermediate
wound, and that bullet wound D appeared to be a distant wound,[24]
neither Dr. Wilson nor the autopsy report provide any evidence from
which a reasonable fact-finder could conclude that the shots were
not fired in rapid succession such that it would have been
practical or even possible for Officer Smith to pause between shots
to determine whether McIntosh no longer presented a reasonable
threat and whether medical aid should be summoned.[25]   The Synopsis
of Dispatch Tape Timeline for the events at issue shows that an
"actor on ground" report was made to HPD at 12:56:40; a "black

---

[23]<u>See</u> Perry Deposition, Exhibit B attached to Plaintiff's
Response, Docket Entry No. 46, p. 20 lines 17-22; and Fitzgerald
Witness Statement, Exhibit I attached to Defendants' Motion, Docket
Entry No. 45, p. 2 ("I heard the officer call on his radio after
the shooting that the suspect was down.").

[24]Deposition of Dr. Stephen Wilson, Exhibit H attached to
Plaintiffs' Response, Docket Entry No. 46, pp. 127-129.

[25]<u>See</u> Autopsy Report, Exhibit P attached to Defendants' Motion,
Docket Entry No. 45, p. 3 ("There are four penetrating gunshot
wounds of the torso. . . These injuries are labeled A through D for
descriptive purposes only; no sequence or severity is implied.").

male, gunshot wound to the stomach," report was made to HPD at 12:57:40; a request for the Houston Fire Department (HFD) and a supervisor was made at 12:59:20; a request for an ambulance was made at 13:00:00; a request for paramedics was renewed at 13:03:40; a request for the ambulance's "ETA," i.e., estimated time of arrival, was made at 13:06:40; and HPD dispatch reported the ambulance was en route at 13:07:40.[26] HFD records show notification received at 13:02, and arrival at the scene at 13:07.[27] Plaintiff has not offered any evidence from which a reasonable fact-finder could conclude that Officer Smith deliberately delayed either the call for medical aid or the arrival of medical aid. Accordingly, the court concludes that Officer Smith is entitled to summary judgment on his qualified immunity defense to the plaintiff's Fourteenth Amendment claim that he violated McIntosh's right not to have his serious medical needs met with deliberate indifference. See City of Revere, 103 S.Ct. at 2983 (obligation to provide medical care to arrestee is satisfied where police officers promptly transported arrestee to a hospital that provided the treatment necessary for his injury); Mace v. City of Palestine, 333 F.3d 621, 626 (5th Cir. 2003) (officers who called ambulance to scene did not violate constitutional right to medical care even

_____

[26]Synopsis of Dispatch Tape Timeline Officer Involved Shooting, 4600 Knoxville, January 8, 2007, Exhibit M attached to Defendants' Motion, Docket Entry No. 45.

[27]Exhibit N attached to Defendants' Motion, Docket Entry No. 45.

though the ambulance was delayed by police chief's decision to have an officer drive the ambulance to the emergency room).

## C.    Conclusions

For the reasons explained above, Officer Smith's motion for summary judgment on the federal claims asserted against him will be granted as to plaintiff's claim for denial of medical care in violation of the Fourteenth Amendment, and denied as to the plaintiff's claims for excessive use of force in violation of the Fourth Amendment and for summary execution in violation of the Fourteenth Amendment.

## IV.    Federal Law Claims Asserted Against the City of Houston

The plaintiff seeks to hold the City of Houston responsible for Officer Smith's actions under a municipal liability theory, asserting that Officer Smith acted as a result of and in accordance with the City's practice, custom, or policy "of using excessive and unjustified, deadly force against minorities."[28]  The plaintiff alleges that this practice, custom, or policy was the moving force behind the City's failure to train and/or supervise Officer Smith.

## A.    Municipal Liability

Municipalities are not liable for the constitutional torts of their employees unless those employees act pursuant to official

---

[28]Plaintiff Danetta McIntosh's First Amended Complaint, Docket Entry No. 44, p. 6 ¶ 25.

approval.  See Monell v. Department of Social Services of City of New York, 98 S.Ct. 2018, 2022 & n.7, (1978) (reaffirming that "the doctrine of respondeat superior is not a basis for rendering municipalities liable under § 1983").  "[I]solated unconstitutional actions by municipal employees will almost never trigger liability." Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir.), cert. denied, 122 S.Ct. 53 (2001) (citing Bennett v. City of Slidell, 728 F.2d 762, 768 n.3 (5th Cir. 1984), cert. denied, 105 S.Ct. 3476 (1985)).  In order to assert a claim for municipal liability under § 1983, a plaintiff must establish three elements: (1) a policymaker, (2) an official policy or custom, and (3) a violation of a constitutional right the "moving force" of which is the official policy or custom.  Id. (citing Monell, 98 S.Ct. at 2036).  An official policy is either:

> (1) A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
>
> (2) A persistent, widespread practice of officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents the municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir. 1984) (en banc).

-22-

## B.    Analysis

The City of Houston argues that it is entitled to summary judgment on the claims that the plaintiff has asserted against it because "[p]laintiff has failed to produce even a scintilla of evidence which would support her allegations against the City regarding any custom, policy or practice which caused the death of Robert McIntosh."[29]  Plaintiff fails to cite any official written or otherwise specially articulated policy that allows Houston police officers to use excessive force against minorities. Instead, the plaintiff alleges that the existence of a City policy for turning a blind eye to the unconstitutional conduct of police officers in using excessive force against minorities may be inferred from proof that

> [i]n just the first two-weeks of 2007, HPD officers shot and killed two unarmed men in Houston — one being Robert McIntosh and the other being a mentally retarded man allegedly armed with a hammer.  From 1994 to 2000, HPD officers fatally shot more than 200 people and critically wounded thousands.   In 2006 alone, thirteen civilians were shot to death and twenty-three seriously injured by HPD officers; several of those killed and injured were unarmed and the vast majority were minorities.[30]

Plaintiff alleges that

> [t]his policy, in addition to being apparent from statistical records, is further evidenced by the fact that HPD routinely attempts to cover-up its officers' unjustified use of excessive and deadly force and

---

[29]Defendants' Motion, Docket Entry No. 45, p. 16 ¶ 25.

[30]Plaintiff Danetta McIntosh's First Amended Complaint, Docket Entry No. 44, p. 6 ¶ 24.

> actively covered-up Smith's shooting of Robert while he
> was handcuffed. By coercing witnesses, tacitly approving
> of and ratifying deadly force against minorities,
> refusing to reprimand its officers following these
> incidents, and its proclivity to "turn a blind eye" to
> gross violations of constitutional rights, HPD has
> created a policy of brutality and excessive force. This
> practice is so pervasive as to have the force of law.[31]

Plaintiff fails to present any statistical evidence regarding
Houston police officers' use of excessive force against minorities
and, instead, argues that the City is liable regardless of whether
Yolanda Perry or Officer Smith is telling the truth.[32]

1. <u>If Yolanda Perry's Version of the Facts is True</u>

Plaintiff argues that if Yolanda Perry's version of the facts
is true, the City is liable "for failing to investigate and
reprimand its employee, Smith, and for thereby ratifying his
conduct."[33]

(a) Cover Up

Assuming that Yolanda Perry's version of the facts is true,
plaintiff argues that

> [t]he Court must find that the City actively covered up
> the fact that Smith shot Robert while he was in
> handcuffs. As unbelievable as most citizens of Houston
> would like that scenario to be, the fact is it has
> happened before. Under Perry's version, this case

---

[31]<u>Id.</u> ¶ 25.

[32]Plaintiff's Response, Docket Entry No. 46, pp. 16-20.

[33]<u>Id.</u> at 17 ¶ 46.

-24-

becomes <u>Webster v. The City of Houston</u>, revisited.  <u>See</u>
<u>Webster v. The City of Houston</u>, 755 F.2d 838 (5th Cir.
1984).  The facts of that case are remarkably similar to
the facts of this case, including witness coercion,
disregard of eye-witness testimony, and ratification by
the City of its officers' reprehensible and unconstitu-
tional conduct.[34]

As evidence that the use of excessive force by Houston police

officers against minorities is so common and well known to the

policymakers that it constitutes a custom that fairly represents

official policy, plaintiff asserts that "[i]t happened in the

<u>Webster</u> case and it likely happened in the McIntosh

investigation."[35]  Plaintiff explains that

> Webster had stolen a vehicle and was apprehended by
> HPD. . . As he exited the stolen vehicle, one of the
> officers shot him in the head and killed him. . . The
> incident was witnessed by a cab driver, who claimed
> Webster was unarmed. . . One of the responding officers
> provided a "throw-down" weapon so that it would appear
> Webster was armed. . . Several of the responding officers
> fabricated a story that Webster had pulled the gun and
> was shot in self defense. . . All of the officers
> involved were no-billed and none were reprimanded; only
> after federal investigators became involved did the truth
> come out, more than a year after the shooting. . . The
> Court called the entire affair "a shockingly heinous
> episode of police misconduct." . . . The Webster Court
> was clear that attempting to conceal the facts of the
> shooting is, in itself, a violation of § 1983.[36]

The City replies that "[o]ne situation, twenty-five years ago, will

hardly satisfy the requirements of <u>Monell</u>. . . failure to reprimand

---

[34]<u>Id.</u>

[35]<u>Id.</u> ¶ 47.

[36]<u>Id.</u>

or investigate is, in itself, not a violation for which § 1983 affords relief."[37]

Taking Perry's version of the facts as true, the mere fact that members of the Houston police department attempted to cover up the facts of a police shooting over twenty years before the shooting at issue in this case is not sufficient to raise a genuine issue of material fact for trial regarding the existence of a persistent, widespread practice of officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy attributable to the governing body of the City.  See Webster, 735 F.2d at 841.  In Peterson v. City of Fort Worth, Texas, 588 F.3d 838, 850 (5th Cir. 2009), the Fifth Circuit explained that "[w]here prior incidents are used to prove a pattern, they 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.'"  588 F.3d at 850 (quoting Webster, 735 F.2d at 842).  The Fifth Circuit also explained that "[a] pattern . . . requires 'sufficiently numerous prior incidents,' as opposed to isolated instances."  Id. (quoting McConney v. City of Houston, 863 F.2d 1180, 1184 (5th Cir. 1989)).  Plaintiff's reliance on a single

---

[37]Defendants' Reply, Docket Entry No. 47, p. 4 ¶ 6.

incident of police misconduct, which -- although similar to the misconduct alleged in this case -- occurred over twenty years before the incident at issue here, is not legally sufficient to raise a genuine issue of fact regarding the existence of a municipal custom or policy.  See Peterson, 588 F.3d at 851 (holding that 27 complaints of excessive force in a three-year period were insufficient to establish a pattern of conduct that is "so common and well-settled as to constitute a custom that fairly represents municipal policy").

> (b)  Ratification

Plaintiff argues that the City is liable because it ratified the use of excessive force in this case.  Plaintiff explains that

> the City ignored Yolanda Perry's and Michael Oliva's statements that [McIntosh] was shot while he was restrained.  The City tried to have Mrs. Perry indicted for perjury, a charge the District Attorney thankfully refused to pursue.  The damage was done, however, and everyone in the Sunnyside neighborhood knew the price that might have to be paid if they offered any testimony against HPD.  Michael Oliva certainly knows the price that will be exacted.  When he refused to change his story to one the City approved of, he was harassed to the point that he filed a complaint.  Of course, HPD found that none of its officers were guilty of harassment.  While HPD's tactics did not convince Mrs. Perry to change her story, harassing Mr. Oliva with impunity caused him to disappear.[38]

In support of this argument, plaintiff cites a sworn statement given by Michael Oliva on January 17, 2007, in which he complained

---

[38]Plaintiff's Response, Docket Entry No. 46, pp. 17-18 ¶ 48.

to members of the Internal Affairs Division that he was being harassed by an individual police officer.  Oliva stated:

> [o]n January 12, 2007 at approximately 6:30 p.m., I was playing basketball at a neighbor's house a few doors east of my address when a police car pulled up with two officers inside.  The driver pointed at me from his vehicle with the window down and asked me why was I on the T.V. talking all that hot shit about what I saw when I know I did not see a damn thing.  He asked me if I knew I could go to jail about lying.  I told the officer that I guess I'm going to have to go to jail because I know I'm not lying.  After that, the officer told me he will see me around.  Then he drove off.  The officer on the passenger side of the police car never said a word. . .
>
> The driver is the same officer who has been harassing me for about a year.  He has never arrested me but he knows me because he sees me out on the corner.  The harassment is always about me being a gang member or drug dealer. I am a Blood and I have also sold drugs before but he has never caught me doing anything wrong.  I do not think he should be harassing me if he does not catch me in the act.
>
> This officer comes around about once a week during the afternoon around 3:00 p.m.  He is the only officer that does this.[39]

In <u>City of St. Louis v. Praprotnik</u>, 108 S.Ct. 915 (1988), the Supreme Court recognized that "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."  <u>Id.</u> at 926.  However, the Fifth Circuit has limited the theory of ratification to "extreme factual situations." <u>Peterson</u>, 588 F.3d at 848 (quoting <u>Snyder v. Trepagnier</u>, 142 F.3d 791, 798 (5th Cir. 1998)).  This case does not present such an

---

[39]Sworn Statement of Michael Oliva, Exhibit P attached to Plaintiff's Response, Docket Entry No. 46.

extreme factual situation.   Compare Snyder, 142 F.3d at 798
(refusing to find ratification where officer shot fleeing suspect
in the back), with Grandstaff v. City of Borger, 767 F.2d 161 (5th
Cir. 1985) (finding ratification where in response to a minor
traffic violation, three patrol cars engaged in a high-speed chase
during which they fired wildly at the suspected misdemeanant; the
object of this chase took refuge on an innocent person's ranch,
where the entire night shift of the city police force converged and
proceeded to direct hails of gunfire at anything that moved,
killing the innocent rancher as he emerged from his own vehicle).
Moreover, the Fifth Circuit has explained that a policymaker who
defends conduct that is later shown to be unlawful does not
necessarily incur liability on behalf of the municipality.   See
Coon v. Ledbetter, 780 F.2d 1158, 1161 (5th Cir. 1986) (emphasizing
the extraordinary facts at issue in Grandstaff and explaining that
Grandstaff "does not stand for the broad proposition that if a
policymaker defends his subordinates and if those subordinates are
later found to have broken the law, then the illegal behavior can
be assumed to have resulted from an official policy").

Taking Perry's version of the facts as true and viewing the
evidence in the light most favorable to the plaintiff, the court
concludes that plaintiff has failed to present evidence of an
extreme factual situation from which a reasonable fact-finder could
conclude that the City of Houston knowingly ratified
unconstitutional conduct committed by Officer Smith.   The City of

Houston has submitted uncontroverted evidence that HPD's Homicide Division and Internal Affairs Division both investigated this incident, that like the evidence before this court the evidence before HPD's investigators contained conflicting versions of the facts, and that following its investigations HPD concluded that Officer Smith had not acted improperly under the circumstances. Uncontroverted evidence shows that HPD's investigative reports were reviewed by a Citizens Review Committee consisting of six individual citizens, all of whom expressed agreement with the conclusions reached by the HPD investigators.[40]  Although plaintiff disagrees with HPD's decision not to reprimand Officer Smith because he had acted reasonably under the circumstances, plaintiff has failed to produce any evidence from which a reasonable fact-finder could conclude either that HPD reached this conclusion knowing that Officer Smith had actually acted improperly, or that HPD's failure to discipline Officer Smith shows that the City ratified unconstitutional conduct.  See Praprotnik, 108 S.Ct. at 915 (emphasizing that "[s]imply going along with the discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy").  See also Peterson, 588 F.3d at 848 n.2 (citing with approval Kibbe v. City of Springfield,

---

[40]Defendants' Reply, Docket Entry No. 47, p. 4.  See also (Exhibit D attached to Docket Entry No. 47, showing results of citizens review committee, and Exhibits B and G attached to Docket Entry No. 45, Leonard Smith's Sworn Statement to HPD Homicide Division, and HPD Internal Affairs Division Investigative Summary, respectively).

777 F.2d 801, 809 n.7 (1st Cir. 1985), a case in which the First Circuit rejected a similar contention that a municipality's failure to discipline a police officer "amounts to the sort of ratification from which a jury properly could infer municipal policy").

Although plaintiff has presented evidence that Michael Oliva complained to HPD's Internal Affairs Investigators about harassment from a police officer, the court is not persuaded that Oliva's sworn statement raises a genuine issue of material fact for trial regarding plaintiff's allegations that HPD attempted to cover up the facts of the shooting and knowingly ratified an unconstitutional shooting.  Oliva's sworn statement shows that the harassment about which he complained was not motivated by any account of the shooting that he may have provided but, instead, by the fact that Oliva was an admitted gang member and drug dealer.  Oliva's sworn statement also shows that the harassment did not begin following any account he may have given of McIntosh's shooting, but had been on-going for about a year.[41]

2.   Если Officer Smith's Version of the Facts is True

Plaintiff argues that if Officer Smith's version of the events is true, the City is liable because it failed to train and supervise him.  Plaintiff explains that she

> 51.  . . . is not complaining about a general lack of
> training that speculatively led to [McIntosh]'s death;

_____

[41]See Sworn Statement of Michael Oliva, Exhibit P attached to Plaintiff's Response, Docket Entry No. 46.

that scenario has been litigated in favor of
municipalities many times. Here, the Plaintiff complains
that Smith's training on the use and capabilities of his
taser, and his taser in drive-stun mode specifically, was
the driving force behind [McIntosh]'s death. At the time
of the shooting, because of his inadequate training,
Smith believed the taser in drive-stun mode was capable
of incapacitating him, which it was not. Had Smith known
that the taser in drive-stun mode was only as dangerous
as a "hard pinch," as Defendants' expert described it, he
would have known that deadly force was not required.

52.  Smith received no training on the use of the Taser
in his cadet class and had only four to eight hours of
training on his taser throughout his career.  Smith's
training was lacking in both quality and quantity;
Smith's ignorance regarding what the taser could and
could not do was the driving force behind [McIntosh]'s
death.

. . .

55.  Because of the inadequacy of the training and
supervision Smith (and the other officers of his cadet
class) received from the City of Houston on his taser, he
perceived a greater-than-actual threat when (and if)
[McIntosh] wrested the taser from Smith's hand.  His
response, given the actual capabilities of the taser, was
excessive.  HPD's failure to adequately train Smith
regarding the capabilities of his taser resulted in
[McIntosh]'s death and demonstrates a conscious
indifference to the constitutional rights of the citizens
of Houston.[42]

The failure to train and/or supervise can amount to a policy

if there is deliberate indifference to an obvious need for training

and supervising in situations where citizens are likely to lose

their constitutional rights because of a lack of training and/or

supervision.  See Brown v. Bryan County, Oklahoma, 219 F.3d 450,

458 (5th Cir. 2000), cert. denied, 121 S.Ct. 1734 (2001).  "[U]nder

_____

[42]Plaintiff's Response, Docket Entry No. 46, pp. 18-20 ¶¶ 51-
52, and 55.

-32-

certain circumstances, § 1983 liability can attach for a single decision not to train [or supervise] an individual officer even where there has been no pattern of previous constitutional violations."   Id. at 459.   However, those circumstances are not present here.   The Fifth Circuit has explained that to hold a municipality liable for failure to train or supervise a police officer, it must have been obvious that

> the highly predictable consequence of not training [Smith] (and not providing supervision over his conduct when making an arrest) was that [Smith] would apply force in such a way that the [constitutional] rights of the citizens of [Houston] were at risk; and, second, that this failure to train or to provide supervision was 'the moving force' that had a specific causal connection to the constitutional injury.

Id. at 461.

The City of Houston has submitted uncontroverted evidence showing that Officer Smith attended two courses in taser training, a four-hour Taser Training 2005 course on October 26, 2004, and a two-hour Taser Training (Tasertron weapon) course on October 21, 1999.[43]  Plaintiff has failed to submit any evidence showing that Smith or any other HPD officer's lack of taser training had caused serious injuries on previous occasions.   Nor has plaintiff submitted any evidence showing a prior pattern by Officer Smith of violating constitutional rights by misusing a taser and/or employing excessive force during an arrest.   Absent such evidence,

---

[43]Houston Police Academy Certification Records for Leonard P. Smith, Exhibit O attached to Defendants' Motion, Docket Entry No. 45.

plaintiff has failed to raise a genuine issue of material fact for trial whether it should have been obvious to City policymakers that the risk of serious injury to a citizen was a "highly predictable consequence" of the failure to train Officer Smith more extensively on the use of tasers and/or force.  See Estate of Davis ex rel. McCully v. City of North Richmond Hills, 406 F.3d 375, 383, 386 (5th Cir. 2005) ("'to succeed on his claim of failure to train or supervise' the plaintiff must demonstrate deliberate indifference, which usually requires a plaintiff to 'demonstrate a pattern of violations'"); Snyder, 142 F.3d at 798 ("proof of a single violent incident ordinarily is insufficient" for liability).

Even assuming that the evidence plaintiff has presented is capable of creating a factual dispute as to whether Officer Smith was sufficiently trained in the use of tasers, "that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city." City of Canton, Ohio v. Harris, 109 S.Ct. 1197, 1206 (1989).  Rather, the "vigorous test" of "deliberate indifference," Brown, 219 F.3d at 461, is required because a "lesser standard of fault would result in de facto respondeat superior liability on municipalities—a result [the Supreme Court] rejected in Monell." Canton, 109 S.Ct. at 1206.  In this case no reasonable fact-finder could conclude that a risk of injury to citizens was the "obvious," "highly predictable consequence" of a lack of taser training.  Plaintiff has not shown that the City had any notice much less "sufficient notice" that

-34-

tasers had previously resulted in an injury of the type experienced by McIntosh.  See Brown, 219 F.3d at 458.  Accordingly, the court concludes that the City is entitled to summary judgment on the plaintiff's claims for failure to train and/or supervise Officer Smith on the use and capabilities of tasers.

## C.    Conclusions

For the reasons explained above, the court concludes that the City of Houston is entitled to summary judgment on the plaintiff's federal law claims regardless of whether Yolanda Perry's version of the facts or Officer Smith's version of the facts is true.

## V.    State Law Claim Asserted Against the City of Houston

Plaintiff alleges that

> [p]ursuant to the Texas Civil Practices and Remedies Code § 101.021, et seq. [the Texas Tort Claims Act (TTCA)], the City is liable to [her] for Robert McIntosh's personal injury and death caused by Officer Smith's negligence in the misuse of tangible personal property while acting within the scope of his employment with the City of Houston.[44]

Plaintiff alleges that Officer Smith was negligent in his use of his taser and firearm against McIntosh, and that Officer Smith's negligent misuse of his taser and firearm was the producing and proximate cause of McIntosh's death and plaintiff's damages.[45] Asserting that these claims are not authorized by the TTCA, and

---

[44]Plaintiff Danette McIntosh's First Amended Complaint, Docket Entry No. 44, p. 8 ¶ 32.

[45]Id.

-35-

that it is entitled to immunity, the City of Houston moves for
summary judgment on the plaintiff's TTCA claim.[46]

## A.   Applicable Law

Texas state law provides a limited waiver of sovereign
immunity under the TTCA.  As one court has explained:

> Under the doctrine of sovereign immunity, a governmental
> unit is not liable for the torts of its officers or
> agents in the absence of a constitutional or statutory
> provision creating such liability . . . The . . . TTCA
> creates a limited waiver of sovereign immunity . . . In
> order for immunity to be waived under the TTCA, the claim
> must arise under one of the three specific areas of
> liability for which immunity is waived, and the claim
> must not fall under one of the exceptions from waiver
> . . . The three specific areas of liability for which
> immunity has been waived are: (1) injury caused by an
> employee's use of a motor-driven vehicle; (2) injury
> caused by a condition or use of tangible personal or real
> property; and (3) claims arising from premise defects
> . . . However, the waiver of immunity does not extend to
> claims arising out of intentional torts.  See TEX. CIV.
> PRAC. & REM.CODE ANN. § 101.057 (Vernon 1997).

Medrano v. City of Pearsall, 989 S.W.2d 141, 143-44 (Tex. App. --
San Antonio 1999, no pet.).  To establish a claim under the TTCA
based on the use of non-defective tangible personal property the
plaintiff must show

> (1) that the property was used or misused by a
> governmental employee acting within the scope of his or
> her employment, and (2) that the use or misuse of the
> property was a contributing factor to the injury.  The
> negligence of the government employee must be the
> proximate cause of the injury and must involve a
> condition or use of tangible personal property under
> circumstances where there would be private liability.

---

[46]Defendants' Motion, Docket Entry No. 45, p. 21.

<u>Morin v. Moore</u>, 309 F.3d 316, 328 (5th Cir. 2002) (quoting <u>Gonzales</u>
<u>v. City of El Paso</u>, 978 S.W.2d 619, 623 (Tex. App. -- El Paso 1998,
no pet.)). Texas law does not allow a plaintiff to avoid the bar
of governmental immunity by describing essentially intentional
conduct as negligence. See <u>Lopez-Rodriguez v. City of Levelland,</u>
<u>Texas</u>, 100 Fed. Appx. 272, 275 (5th Cir. 2004) (citing <u>Hucker v.</u>
<u>City of Beaumont</u>, 144 F.Supp.2d 696, 708 (E.D. Tex. 2001)).

**B.   Analysis**

The City of Houston is a governmental unit to which
governmental immunity applies. Plaintiff argues that as with the
other claims for which the defendants seek summary judgment, "this
claim depends on which version of the events a jury believes."[47]
Plaintiff explains that

> [b]ased on Smith's story, at the very least, he
> 1) negligently created the initial danger through his use
> of the taser on [McIntosh] in the ditch, 2) was negligent
> in deciding to shoot [McIntosh] when faced with a threat
> that amounts to a hard pinch and 3) was negligent when he
> backed up after shooting [McIntosh] three times at point-
> blank range and shot him again.
>
>        . . . If the jury believes Yolanda Perry and the
> other witnesses that will testify [McIntosh] was shot
> while in handcuffs, then Smith's actions were intentional
> and the City is not liable under the [TTCA]. . . On the
> other hand, if the jury believes Smith's story, they
> could easily conclude that Smith was, at the very least,
> negligent in his use of the taser, which created the
> snowball-effect that culminated in [McIntosh]'s death.
> If Smith had known that the taser in drive-stun mode
> would only cause [McIntosh] to thrash around, he would

_____

[47]Plaintiff's Response, Docket Entry No. 46, p. 21 ¶ 58.

have handcuffed him instead of tasing him in the back as
hard as he could. . .

     Because this issue is replete with fact issues that
rightfully belong to the jury, the Court should deny
Defendants' Motion on this claim.[48]

The TTCA waives immunity only to the extent specified by the
Act.  The summary judgment evidence that raises a genuine issue of
material fact as to whether Officer Smith's decision to shoot
McIntosh was reasonable under the circumstances does not raise a
genuine issue of material fact capable of defeating the City's
motion for summary judgment on plaintiff's TTCA claim because
regardless of whether a jury would believe Yolanda Perry's version
of the facts or Officer Smith's version of the facts, the City is
not liable under the TTCA for the shooting of McIntosh by Officer
Smith because that shooting was an intentional act.  See Pineda v.
City of Houston, 175 S.W.3d 276, 282 (Tex. App. -- Houston [1st
Dist.] 2004, no pet.); Harris County, Texas v. Cabazos, 177 S.W.3d
105, 111 (Tex. App. -- Houston [1st Dist.] 2005, no pet.) ("Here,
the gravamen of appellee's claim is that a Harris County sheriff
wrongfully shot appellee. . . If a plaintiff pleads facts which
amount to an intentional tort, no matter if the claim is framed as
negligence, the claim generally is for an intentional tort and is
barred by the TTCA.").

Although plaintiff attempts to characterize the tasing and
shooting at issue here as negligent acts, the facts alleged in her

---

[48]Id. at ¶¶ 57-59.

-38-

amended complaint contradict this characterization. Plaintiff alleges that

> 8. As [McIntosh] fled, Smith "tased" [McIntosh] in the back; only one dart attached to [McIntosh] and he continued to flee. Smith continued to pursue [McIntosh] down Knoxville Street. [McIntosh], who was not physically fit, became exhausted and fell in a bar-ditch on his stomach.
>
> 9. Smith, although straddling [McIntosh] and in complete control of the situation, repeatedly struck [McIntosh] in the face with his taser and continued to "drive-stun" [McIntosh] with his taser. According to at least one eye-witness, [McIntosh] capitulated and was handcuffed by Smith.
>
> 10. Smith, then in complete control of [McIntosh] and the situation, brought [McIntosh] to his knees. Officer Smith then placed his .40 caliber pistol to [McIntosh]'s chest and fired three bullets at point-blank range. Smith then stood up, took a few steps back, and fired the fatal bullet into [McIntosh]'s crotch.[49]

These allegations do not involve the accidental discharge of a weapon by a police officer but, instead, intentional decisions to tase and shoot McIntosh. See Cabazos, 177 S.W.3d at 112 ("In this case, appellee alleged in his petition that Haynes was negligent in discharging his pistol and in effectuating appellee's arrest, thus injuring appellee. . . However, despite appellee's efforts to phrase his claims in terms of negligence, his focus is on the shooting of appellee."). See also Medrano, 989 S.W.2d at 144 (although plaintiffs alleged negligent conduct, court found officer acted intentionally and held that the plaintiffs could not

---

[49]Plaintiff Danetta McIntosh's First Amended Complaint, Docket Entry No. 44, pp. 2-3 ¶¶ 8-10.

-39-

circumvent the intentional tort exception by mere allegations of negligence against the city).

## C.   Conclusions

For the reasons explained above, the court concludes that the City of Houston is entitled to summary judgment on plaintiff's TTCA claim because that claim arises from Officer Smith's intentional conduct, and such claims are not cognizable under the TTCA.

## VI.   Conclusions and Order

For the reasons explained in § III, the court concludes that genuine issues of material fact preclude the court from granting summary judgment to Officer Smith on the plaintiff's claims for excessive use of force in violation of the Fourth Amendment and for summary execution in violation of the Fourteenth Amendment, but that Officer Smith is entitled to summary judgment on plaintiff's claim for denial of medical care in violation of the Fourteenth Amendment.   For the reasons explained in §§ IV and V above, the court concludes that the City of Houston is entitled to summary judgment on all of the claims that plaintiff has asserted against it.   Accordingly, Defendants' Motion for Summary Judgment (Docket Entry No. 45) is **GRANTED IN PART AND DENIED IN PART.**

**SIGNED** at Houston, Texas, on this 2nd day of February, 2010.

SIM LAKE
UNITED STATES DISTRICT JUDGE

-40-